## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA,** | : | **CIVIL ACTION NO. 1:05-CV-1814** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SUSQUEHANNA AREA REGIONAL AIRPORT AUTHORITY,** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

The Commonwealth of Pennsylvania, through the Office of Attorney General, initiated this action as *parens patriae*, to enjoin the defendant, Susquehanna Area Regional Airport Authority ("SARAA"), from acquiring, by eminent domain, a tract of land adjacent to the Harrisburg International Airport ("HIA"). This land is the site of a private parking enterprise servicing HIA. In its complaint, the Commonwealth invokes federal antitrust laws, seeking to enjoin SARAA's "conduct in unlawfully obtaining and maintaining a monopoly for airport parking services." (Doc. 1 ¶ 52.)

Presently before the court is a motion to dismiss (Doc. 6) filed by SARAA. Based upon clear application of Parker[1] immunity, the court is constrained to grant defendant's motion.

---

[1] Parker v. Brown, 317 U.S. 341 (1943); see infra Part III.A.

I.    **Statement of Facts**[2]

In 1967, the Cramer family purchased a tract of land located on West

Harrisburg Pike in Lower Swatara Township, Dauphin County, Pennsylvania.

(Doc. 1 ¶¶ 8-9.)  Although the Cramer tract is adjacent to property owned by

SARAA, it is *pro tanto* separated from SARAA property by a road and railroad

tracks.  (Doc. 1 ¶¶ 10, 22.)[3]

For over twenty-five years, the Cramer family has used their land for airport

parking.  (Doc. 1 ¶¶ 8, 11.)  Cramer Airport Parking currently offers 1,000 parking

spaces, which are approximately 0.8 miles from HIA, with the capacity to expand to

2,000 parking spaces.  (Doc. 1 ¶ 12.)  Parking rates are $5 per day or $28 per week

and discount coupons are available.  (Doc. 1 ¶ 12.)  Customers are shuttled between

Cramer Airport Parking and HIA.  (Doc. 1 ¶ 12.)

SARAA is a joint municipal authority created in 1997 pursuant to the

Pennsylvania Municipality Authorities Act ("MAA"), as amended, 53 PA. CONS.

STAT. ANN. §§ 5601-5623.  (Doc. 1 ¶ 4.)  SARAA offers 2,474 garage parking spaces at

the terminal in Lot A and 3,100 parking spaces approximately 0.5 miles from HIA in

---

[2] In accordance with the standard of review for a motion to dismiss, the court will present the facts as alleged in the complaint.  See infra Part II.  The statements contained herein reflect neither the findings of the trier of fact nor the opinion of the court as to the reasonableness of the parties' allegations.

[3] The railroad tracks are owned and operated by Amtrak and Norfolk Southern.

Lot B (Economy Long-Term Parking, "SmartPark").[4]  (Doc. 1 ¶ 13-14.)  SARAA

purportedly has the capacity to expand to 9,000 parking spaces.  (Doc. 1 ¶ 15.)  The

parking rates for Lot A are $1 per hour for the first two hours and $2 for each

additional hour, up to a daily maximum rate of $14.  (Doc. 1 ¶ 13.)  The rates for

SmartPark are $5 per day and $30 per week.  (Doc. 1 ¶ 14.)  A shuttle takes

customers from SmartPark to HIA.  (Doc. 1 ¶ 14.)

On March 30, 2005, SARAA filed a Declaration of Taking in the Court of

Common Pleas for Dauphin County to acquire the Cramer property through

eminent domain.  (Doc. 1 ¶ 18.)  SARAA claims that it intends to use this property to

"construct appropriate facilities thereon and/or utilize such property in a manner

which will service, improve, promote and maintain the continued practices

conducted by the Airport."  (Doc. 1 ¶ 19.)

On September 8, 2005, the Commonwealth commenced the instant action

(Doc. 1) against SARAA pursuant to 71 Pa. Cons. Stat. Ann. § 732-204(c) ("The

Attorney General shall represent the Commonwealth and its citizens in any action

brought for violation of the antitrust laws of the United States and the

Commonwealth.").  The complaint alleges antitrust violations under Section 7 of the

Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2, and

seeks:  (1) a permanent injunction to prevent SARAA from acquiring the assets of

Cramer through eminent domain proceedings or any other means; (2) a permanent

---

[4] The Commonwealth alleges that Lots A and B operate well below capacity.
(Doc. 1 ¶ 17.)

injunction to prevent SARAA from interfering with Cramer's operation of an airport parking business serving HIA; (3) a declaratory judgment that SARAA's proposed acquisition of Cramer's assets violates Section 7 of the Clayton Act; (4) a declaratory judgment that SARAA's proposed acquisition of Cramer's assets violates Section 2 of the Sherman Act; (5) costs and reasonable attorneys' fees; and (6) "other just and proper relief."

In its complaint, the Commonwealth asserts that SARAA has no actual plans for the Cramer property and that, absent agreements from Amtrak and Norfolk Southern to move the railroad tracks and provide a means of access between the property and the airport, acquisition of the property provides no benefit to SARAA for aviation-related development.  (Doc. 1 ¶¶ 20, 22.)  The Commonwealth contends that SARAA's true motives for taking the property are to aid SARAA in a tax dispute pending with the Middletown Area School District and to eliminate Cramer Airport Parking as a competitor.  (Doc. 1 ¶ 24.)

SARAA filed the instant motion to dismiss (Doc. 6) on September 28, 2005. SARAA argues that dismissal is appropriate because:  (1) the state action doctrine (i.e., Parker immunity) shields SARAA, a municipal authority, from antitrust claims; (2) the Anti-Injunction Act[5] bars the relief requested; (3) the Noerr-Pennington doctrine[6] protects SARAA from antitrust challenge; (4) this case lacks

---

[5] 28 U.S.C. § 2283.

[6] See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965).

the requisite nexus with interstate commerce, thereby depriving the court of subject matter jurisdiction; and (5) eminent domain proceedings cannot be restrained by another governmental actor under federal antitrust laws.  The parties have fully briefed these issues and the motion is now ripe for disposition.

## II.   Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of claims that fail to assert a basis upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).  In the context of a motion to dismiss under Rule 12(b)(6), the court must accept as true all of the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom.  Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000) (citing Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)).  Although the court is generally limited in its review to the face of the complaint, it "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

Federal notice pleading rules do not require plaintiffs to allege affirmatively every aspect of their claims, but only to present sufficient facts to allow the opposing party to conduct discovery and prepare a defense.  See FED. R. CIV. P. 8(a) (stating that the complaint should include "a short and plain statement of the claim showing that the pleader is entitled to relief"); see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Thus, courts should not dismiss a complaint for failure to state a

claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id.; see Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002). Under this liberal pleading policy, courts should generally grant plaintiffs leave to amend their claims before dismissing a complaint that is merely deficient. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000).

## III.   Discussion

### A.   The State Action Doctrine and *Parker* Immunity

Federal antitrust laws recognize the importance of free markets and competition and prohibit the restraint of such competition. This prohibition, however, is generally applicable only to private, not governmental, conduct. The state action doctrine provides immunity—often referred to as Parker immunity—from federal antitrust laws for actions taken by a state government. See Mariana v. Fisher, 338 F.3d 189, 198 (3d Cir. 2003) (citing Parker v. Brown, 317 U.S. 341 (1943)).[7] The origin of this doctrine is the Supreme Court's decision in Parker v. Brown:

> We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

---

[7] See generally BRIAN W. BLAESSER ET AL., FEDERAL LAND USE LAW & LITIGATION §§ 12:1-12:18 (2005); STEVEN J. EAGLE, REGULATORY TAKINGS § 4-7 (3d ed. 2005).

> The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state. . . .
>
> There is no suggestion of a purpose to restrain state action in the Act's legislative history.

Parker, 317 U.S. at 350-51.  Parker immunity "is grounded in federalism and respect for state sovereignty."  Mariana, 338 F.3d at 201. ("[T]he 'interest in protecting the acts of the sovereign state, even if anticompetitive, outweighs the importance of a freely competitive marketplace.'" (quoting A.D. Bedell Wholesale Co. v. Philip Morris Inc., 263 F.3d 239, 254-55 (3d Cir. 2001))).

Unlike actions of a state legislature, state supreme court, or state executive department, actions of a municipality are not automatically immune from federal antitrust laws under the state action doctrine.  See Town of Hallie v. City of Eau Claire, 471 U.S. 34, 38 (1985); see also City of Lafayette, La. v. La. Power & Light Co., 435 U.S. 389, 410 (1978).[8]  Instead, a municipality will be immune from such laws only if it engaged in "the challenged activity pursuant to a clearly expressed state policy."[9]  Town of Hallie, 471 U.S. at 40.  Legislation enabling a municipality's actions need not explicitly authorize activity with anticompetitive effects to satisfy the "pursuant to a clearly expressed state policy" standard.  See id. at 43-44

---

[8] See generally Phillip Areeda, Antitrust Immunity for "State Action" After Lafayette, HARV. L. REV. 435 (1981).

[9] Unlike a private party seeking Parker immunity, SARAA, as a municipality, is not subject to the requirement that its conduct be actively supervised by the state.  See Town of Hallie, 471 U.S. at 46 ("We now conclude that the active state supervision requirement should not be imposed in cases in which the actor is a municipality.").

("[Explicit authorization of anticompetitive effects] embodies an unrealistic view of

how legislatures work and of how statutes are written.  No legislature can be

expected to catalog all of the anticipated effects of a statute . . . .").  Rather,

legislation need only authorize activity that "foreseeably will result in

anticompetitive effects."  <u>Id.</u> at 43; <u>see also</u> <u>Wheeler v. Beard</u>, No. Civ.A. 03-4826,

2005 WL 1217191, at *3 (E.D. Pa. May 19, 2005) ("A policy is considered to be 'clearly

articulated' if state statutes create a regulatory structure that would logically result

in anti-competitive effects."); <u>Pa. Coach Lines, Inc. v. Port Auth. of Allegheny</u>

<u>County</u>, 874 F. Supp. 666, 671 (W.D. Pa. 1994).[10]  In sum, a municipal authority will

ordinarily[11] be immune from federal antitrust laws under the state action doctrine if

it acts pursuant to a clearly expressed state policy with potentially anticompetitive

results.

Therefore, the controlling questions in this case are whether the MAA

empowers municipal authorities to engage in activities with foreseeable

anticompetitive effects and whether any limitations in the MAA or exceptions to

<u>Parker</u> immunity apply to the instant matter.

---

[10] <u>See also</u> Thomas M. Jorde, <u>Antitrust and the New State Action Doctrine:  A</u>
<u>Return to Deferential Economic Federalism</u>, 75 Cal. L. Rev. 227, 242-44 (1987)
("[T]he [<u>Hallie</u>] Court held that a state statute need not explicitly indicate legislative
intent to supplant competition with regulation.  Rather, it is sufficient if a reading of
the statute indicates that it 'clearly contemplate[s]' anticompetitive activity, or that
such conduct is a 'foreseeable' or 'logical' result of the authority delegated.").

[11] The market participant exception to <u>Parker</u> immunity is addressed in
Part III.D <u>infra</u>.

B.   **The Municipality Authorities Act and Potential Anticompetitive Activities**

In the matter *sub judice*, SARAA is a joint municipal authority created pursuant to the MAA, as amended, 53 PA. CONS. STAT. ANN. §§ 5601-5623.  The MAA is enabling legislation, conferring upon local municipalities broad power to form authorities for a variety of enumerated projects and purposes, including the ownership and operation of a public airport.

> **Scope of projects permitted.**—Every authority incorporated under this chapter shall be a body corporate and politic and shall be for the purposes of financing working capital; acquiring, holding, constructing, financing, improving, maintaining and operating, owning or leasing, either in the capacity of lessor or lessee, projects of the following kind and character . . . :
>
> *  *  *
>
> (3)   Transportation, marketing, shopping, terminals, bridges, tunnels, flood control projects, highways, parkways, traffic distribution centers, parking spaces, airports and all facilities necessary or incident thereto.

Id. § 5607(a)(3).

In addition, the MAA specifically confers upon municipal authorities the power of eminent domain:

> **Powers**.—Every authority may exercise all powers necessary or convenient for the carrying out of the purposes set forth in this section, including, but without limiting the generality of the foregoing, the following rights and powers:
>
> *  *  *
>
> (15)   To have the power of eminent domain.

Id. § 5607(d)(15).

The above-quoted language provides the statutory basis for development of authority-owned and authority-operated airports, including development through condemnation. Thus, a municipal authority such as SARAA may operate and expand airport facilities pursuant to a clearly articulated state policy.

That anticompetitive effects are a foreseeable result of an authority's power to take property by eminent domain is obvious. It cannot reasonably be disputed that the exercise of this power may result in the displacement of competitive facilities. Indeed, the topography or characteristics of a tract of land may make it uniquely suited for particular projects or facilities. Logically, private and public entities may be equally enamored with a specific location because of its suitability for a particular purpose.

In fact, two reported cases, involving authorities incorporated under the MAA, provide clear illustrations of anticompetitive conduct sanctioned by the MAA. In In re Condemnation of 49.0768 Acres (Thompson Appeal), 233 A.2d 237, 239 (Pa. 1967), an airport authority incorporated under the MAA used the power of eminent domain to eliminate the only privately-operated airport. Similarly, in Dauphin County Gen. Auth. v. Dauphin County Bd. of Assessments, 768 A.2d 895, 898 (Pa. Commw. Ct. 2001), another authority incorporated under the MAA acquired properties that competed with existing businesses serving substantially the same purpose. In both cases state courts upheld the authorities' anticompetitive activities.

10

Moreover, the Pennsylvania legislature specifically acknowledged the potential anticompetitive effects of the broad powers it granted to municipal authorities under the MAA when it enacted the following *anticompetitive* provision:

> The purpose and intent of this chapter being to benefit the people of the Commonwealth by, among other things, increasing their commerce, health, safety and prosperity and not to unnecessarily burden or interfere with existing business by the establishment of competitive enterprises; none of the powers granted by this chapter shall be exercised in the construction, financing, improvement, maintenance, extension or operation of any project or projects or providing financing for insurance reserves which in whole or in part shall duplicate or compete with existing enterprises serving substantially the same purposes.

53 PA. CONS. STAT. ANN. § 5607(b)(2).

It is undisputed that SARAA is a municipal authority formed by a group of three counties, two cities, and two townships for the purpose of owning and operating Harrisburg International Airport and Capitol City Airport.  Pursuant to the provisions of the MAA, SARAA is vested with the power of eminent domain and may exercise this power in the operation of its airports and "all facilities necessary or incident thereto." Id. § 5607(a)(3), (d)(15).  Based upon the foregoing, the court finds that SARAA is a municipal authority operating an airport, as expressly contemplated by state statute, and that the exercise of its statutory powers may have anticompetitive effects.

11

### C.    Limitations in the Municipality Authorities Act

The Commonwealth contends that the anticompetitive provision of the MAA, 53 PA. CONS. STAT. ANN. § 5607(b)(2), expressly limits an authority's power to displace existing competition, thereby disaffirming Parker immunity.  The Pennsylvania Supreme Court in Thompson Appeal previously rejected this argument and the court finds Thompson Appeal dispositive.[12]

In Thompson Appeal, a municipal authority condemned a private airport for use as a municipal airport and eliminated the only private provider of airport services.  See 233 A.2d at 238-39.  The Pennsylvania Supreme Court held that the purpose of the anticompetitive provision was "to protect businesses which will be competing with the condemnor's operations, because any loss of business resulting from such competition is not compensable under the Eminent Domain Code."  Id. at 239.  The court concluded that the anticompetitive provision of the MAA did not limit the authority's power of eminent domain.  It opined that the state legislature's "deliberate omission of the power *to acquire and hold property* [from the anticompetitive provision] shows a *clear legislative design* that the proviso was *not*

---

[12] The court is bound by the statutory interpretations of the state's highest court.  See Estate of Meriano v. Comm'r, 142 F.3d 651, 659 (3d Cir. 1998) (""[W]hen federal courts are required to interpret or apply state law, we consider and accept the decisions of the state's highest court as the ultimate authority of state law." (citing Colantuno v. Aetna Ins. Co., 980 F.2d 908, 909 (3d Cir.1992))); Commonwealth v. Brown, 373 F.2d 771, 777 (3d Cir. 1967) (stating that state appellate court's interpretation of state statute is conclusive and binding on federal courts).

to be a restriction upon the authority's right to condemn."[13]  Id. (emphasis added).

Compare 53 PA. CONS. STAT. ANN. § 5607(b)(2) (prohibiting "the construction,

financing, improvement, maintenance, extension or operation of any project . . .

which in whole or in part shall duplicate or compete with existing enterprises"),

with id. § 5607(a) (including "acquiring" and "holding" in the list of powers of an

authority).

The court is persuaded that the analysis of the anticompetitive provision of

the MAA set forth by the Pennsylvania Supreme Court in Thompson Appeal is

---

[13] The Commonwealth contends the term "construction" as used in the anticompetitive provision expressly restricts the power of eminent domain, prohibiting condemnation for anticompetitive purposes, because the statutory definition of "construction" includes "acquisition."  See 53 PA. CONS. STAT. ANN. § 5602 ("'Construction.' Acquisition and construction.  The term 'to construct' shall mean and include to acquire and to construct, all in such manner as may be deemed desirable.").  The Commonwealth, however, neglects to mention that the definition of "construction" has not been altered since the original enactment of the MAA in 1945.  See 1945 Pa. Laws 382, 382 ("The term 'construction' shall mean and include acquisition and construction, and the term 'to construct' shall mean and include to acquire and to construct, all in such manner as may be deemed desirable.").  Despite this statutory definition, the state supreme court held that the deliberate omission of the power *to acquire and hold property* evinced clear legislative intent that the anticompetitive provision was not a limitation on the power of eminent domain.  See Thompson Appeal, 233 A.2d at 239.

controlling.[14]  As in Thompson Appeal, the challenged conduct *sub judice* is

SARAA's exercise of the power of eminent domain.  And, just as the Thompson

Appeal authority eliminated the only other provider of airport services in the area,

SARAA's condemnation of the Cramer property will ostensibly eliminate the only

other provider of airport parking.

The Commonwealth contends that the holding in Thompson Appeal does not

apply because the Commonwealth represents consumers who will receive no

compensation from the taking.  See Thompson Appeal, 233 A.2d at 239 ("Where, as

here, [the challenger—the condemnee] . . . will have received full compensation for

the taking the [anticompetitive provision's] *raison d'etre* disappears.").  This

---

[14] The Commonwealth references Northeast Jet Center, Ltd. v. Lehigh-Northampton Airport Authority for the proposition that the anticompetitive provision limits the application of Parker immunity.  See 767 F. Supp. 672, 682 (E.D. Pa. 1991) ("Given Pennsylvania's limitation of the activities of municipal authorities, as found in [the anticompetitive provision of the MAA], we believe that the plaintiff has managed to avoid application of [Parker immunity] to the antitrust laws, at least at this point.").  Northeast Jet is factually distinguishable.  Unlike Thompson Appeal and the instant matter, the Northeast Jet authority's challenged conduct involved an alleged conspiracy to restrain trade, not the use of eminent domain proceedings.  The Northeast Jet authority's actions created direct competition between the authority and another enterprise.  See id.  These actions violated the primary purpose of the anticompetitive provision "to protect businesses which will be competing with" the authority *after* the challenged conduct.  See id. (citing the primary purpose of the anticompetitive provision from Thompson Appeal); see also 53 PA. CONS. STAT. ANN. § 5607(b)(2) (stating that "none of the powers granted" to authorities under the MAA "shall duplicate or compete with existing enterprises serving substantially the same purposes").  In the matter *sub judice*, by the Commonwealth's own admission, the challenged conduct will not result in SARAA competing with another provider of airport parking services.  (See Doc. 1 ¶ 1 ("SARAA's acquisition of the assets of Cramer will eliminate competition for parking services at [HIA] leaving SARAA as the only provider of parking service.")).

argument is without merit.  Application of <u>Parker</u> immunity depends upon the

challenged *conduct*, not the *challenger* of the conduct.  <u>See</u> <u>Town of Hallie</u>, 471 U.S.

at 40, 43.  Accordingly, the Commonwealth's status as challenger in the instant

action and its inability to receive compensation for the taking do not alter the

court's analysis of whether SARAA engaged in "the challenged activity pursuant to

a clearly expressed state policy" with anticompetitive effects as a foreseeable

result.[15]  <u>See</u> <u>id.</u>

---

[15] The Commonwealth also argues that post-<u>Thompson Appeal</u> amendments
to the MAA compel a different statutory interpretation of the anticompetitive
provision.  In support of this argument, the Commonwealth correctly observes that
the 1984 amendment of the MAA, <u>see</u> 1984 Pa. Laws 1246, 1246-48, split the
anticompetitive provision and the powers provision into separate paragraphs.
<u>See</u> <u>Thompson Appeal</u>, 233 A.2d at 239 (noting that "[t]he anticompetitive proviso
appears in the same paragraph [as the powers provision]").  The Commonwealth
argues that this split reflects a legislative intent to change the impact of the
anticompetitive provision to restrict an authority's right to condemn.  This
argument is illogical.  The 1984 amendment did not change the substantive
language of the anticompetitive provision; the General Assembly did not add the
"power to acquire or hold property" to the provision.  <u>See</u> <u>id.</u>; 1 PA. CONS. STAT.
ANN. § 1922(4) (stating the presumption that "when a court of last resort has
construed the language used in a statute, the General Assembly in subsequent
statutes on the same subject matter intends the same construction to be placed
upon such language"); <u>Gade v. Csomos</u>, 8 F.3d 137, 139-40 (3d Cir. 1993) (same); <u>see
also</u> 2001 Pa. Laws 287, 351 ("[A]ny difference in language between 53 Pa.C.S. Ch.
56 and the Municipality Authorities Act of 1945 is intended only to conform to the
style of the Pennsylvania Consolidated Statutes and is not intended to change or
affect the legislative intent, judicial construction or administration and
implementation of the Municipality Authorities Act of 1945.").  The <u>Thompson
Appeal</u> court identified specific language that would restrict an authority's right to
condemn.  That the legislature chose not to incorporate this language is
determinative of the issue.  The court is simply not persuaded that the 1984
amendment was intended to alter the primary purpose of the anticompetitive
provision—"to protect businesses competing with the condemnor *after the taking*."
<u>Thompson Appeal</u>, 233 A.2d at 239 (emphasis added).

For the foregoing reasons, the court finds that the anticompetitive provision

of the MAA does not limit SARAA's power of eminent domain.  Accordingly,

SARAA is entitled to <u>Parker</u> immunity.

### D.    <u>Market Participant Exception</u>[16]

Citing <u>Bedell</u>, the Commonwealth argues that <u>Parker</u> immunity does not

apply because SARAA is using its power of eminent domain for improper purposes,

to wit:  to eliminate its only competitor for airport parking services and to gain

leverage in an ongoing dispute with a local school district.[17]  The Commonwealth

contends that SARAA's motives for the taking transform SARAA into a market

---

[16] The court observes that neither Supreme Court nor Third Circuit jurisprudence has clearly articulated the parameters of the market participant exception to <u>Parker</u> immunity.  For example, in <u>City of Columbia v. Omni Outdoor Adver., Inc.</u>, the Supreme Court stated:  "We reiterate that, with the *possible* market participant exception, *any* action that qualifies as state action is '*ipso facto* . . . exempt from the operation of the antitrust laws.'"  499 U.S. 365, 379 (1991) (first emphasis added) (citation omitted).  Similarly in <u>Bedell</u>, the Third Circuit observed, *in a footnote*, that "[t]here is also a market participant exception to actions which might otherwise be entitled to <u>Parker</u> immunity."  263 F.3d at 265 n.55; <u>cf.</u> <u>Mariana</u>, 338 F.3d at 203 (discussing <u>Parker</u> immunity, but not a market participant exception, and noting that "[w]e cannot in conscience characterize the discussion on <u>Parker</u> immunity in <u>Bedell</u> as dicta.").  Nevertheless, the court will assume appellate recognition of the market participant exception and await further clarification from the Third Circuit and Supreme Court.

[17] The court notes that neither the complaint nor the briefs explain the nature of the advantage SARAA is attempting to secure in its dispute with the local school district.  Nevertheless, in accordance with the applicable standard of review, the court will accept the allegations as true.  <u>See</u> <u>supra</u> Part II.

participant.  The court finds that, regardless of SARAA's *motives*, SARAA's *actions* are decidedly governmental and, therefore, SARAA is entitled to <u>Parker</u> immunity.

In <u>Bedell</u>, the Third Circuit discussed a market participant exception to <u>Parker</u> immunity by analogizing it to Dormant Commerce Clause jurisprudence. <u>See</u> <u>Bedell</u>, 263 F.3d at 265 n.55.  Under the Dormant Commerce Clause, a state is prohibited from imposing regulations that benefit the economic interests within the state at the expense of such interests outside the state.  <u>See</u> <u>Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.</u>, 298 F.3d 201, 210 (3d Cir. 2002) (citing <u>W. Lynn Creamery, Inc. v. Healy</u>, 512 U.S. 186, 192-93 (1994)).  The market participant exception to this prohibition recognizes the dichotomy between the state's role as a rulemaker and its role as a competitor:  "[The market participant exception] differentiates between a State's acting [i]n [i]ts distinctive governmental capacity, and a State's acting in the more general capacity of a market participant; only the former is subject to the limitations of the [Dormant] Commerce Clause."  <u>New Energy Co. v. Limbach</u>, 486 U.S. 269, 277 (1988), <u>cited in</u> <u>Bedell</u>, 263 F.3d at 265 n.55. In the context of <u>Parker</u> immunity, a market participant exception would eliminate a municipal authority's immunity from antitrust laws when it acts simply as another competitor in the marketplace.

The Commonwealth's market participant/improper motive argument ignores the distinctly governmental nature of the challenged conduct.  Eminent domain is a power unique to the government:  the federal government derives this power from the Takings Clause of the Fifth Amendment; state governments derive this power

from the Fourteenth Amendment.  See STEVEN J. EAGLE, REGULATORY TAKINGS § 1-1, at 5 & n.4 (3d ed. 2005).  A state legislature may choose to exercise this power directly or indirectly, as in the instant matter, by delegating it.  See 29A C.J.S. Eminent Domain § 22 (2005).  In exercising this delegated power by filing a Declaration of Taking, SARAA must comply with specific statutory requirements set forth in the Pennsylvania Eminent Domain Code.[18]  See Nw. Lehigh Sch. Dist. v. Agric. Lands Condemnation Approval Bd., 559 A.2d 978, 980 (Pa. Commw. Ct. 1989) ("[The power of eminent domain] can only be called into operation by the authority of the legislature and must be exercised . . . in the manner and *with the limitations provided by law*." (citing Interstate Cemetary Co. Appeal, 222 A.2d 906 (Pa. 1966))).

Moreover, the Supreme Court previously addressed the issue of improper motive in City of Columbia v. Omni Outdoor Advertising, Inc., albeit in the context of conspiracy allegations.  In Omni, the Supreme Court specifically rejected a conspiracy exception to Parker immunity that would require an examination of "corrupt or bad faith decisions" and "selfish or corrupt motives" and a determination "not whether the action was in the public interest, but whether the

_____

[18] See 26 PA. CONS. STAT. ANN. §§ 1-101 to 1-903 (Eminent Domain Code).  In the state court condemnation proceedings in the instant matter, Stanford E. Cramer, the condemnee, has raised preliminary objections to the condemnation averring that, *inter alia*, the Declaration of Taking does not demonstrate a public need or purpose, SARAA's action violates the anticompetitive provision of the MAA, and SARAA's action is in bad faith and an abuse of discretion.  See In re Condemnation by SARAA of Land and Interests in Land Owned by Stanford E. Cramer in Lower Swatara Township, Dauphin County, Pennsylvania for Airport Purposes, No. 2005-CV-1282-CN, Preliminary Objections (Ct. Com. Pl. Apr. 29, 2005).

officials involved thought it to be so."  499 U.S. 365, 374-76 (1991) ("[Such an inquiry] would require the sort of deconstruction of the governmental process and probing of the official 'intent' that we have consistently sought to avoid."). Similarly, allegations of an improper purpose cannot transform the exercise of the power of eminent domain—a distinctly governmental action—into the action of a market participant.  To do so would make all eminent domain proceedings vulnerable to a claim of ill motives, an accusation common to most condemnation actions.  See id. at 374-75 (rejecting a conspiracy exception to Parker immunity because "such an exception would virtually swallow up the Parker rule" as "[a]ll anticompetitive regulation would be vulnerable to a 'conspiracy' charge").  The purpose for the taking of the Cramer property is properly before the state court in the condemnation proceedings[19] and it does not alter the court's conclusion that SARAA is a governmental actor in the instant matter.

---

[19] The state requires SARAA to specify the purpose of the condemnation and to provide just compensation for the taking.  See 26 PA. CONS. STAT. ANN. §§ 1-402, 1-407.  During condemnation proceedings, the state court will determine whether SARAA is authorized to take the Cramer property pursuant to the MAA.  See, e.g., Thompson Appeal, 233 A.2d at 239; In re Condemnation of a Permanent Right-of-Way, 873 A.2d 14 (Pa. Commw. Ct. 2005).  For example, the court may invalidate the taking upon a showing of "palpable bad faith."  See, e.g., Redev. Auth. of Erie v. Owners or Parties in Interest, 274 A.2d 244, 247 (Pa. Commw. Ct. 1971) ("Bad faith becomes palpable when such motive is obvious or readily perceived.  The courts have the responsibility to see that an authority has not acted in bad faith, and that property be taken by eminent domain only to the extent reasonably required for the purpose for which the power is exercised.").  Thus, the purpose for a taking is addressed in state court condemnation proceedings, but does not inform the analysis of Parker immunity.

## IV.   <u>Conclusion</u>

SARAA engaged in conduct—exercising its power of eminent domain to take the Cramer property—pursuant to a clearly expressed state policy with anticompetitive effects as a foreseeable result.  The anticompetitive provision of the MAA does not restrict SARAA's power of eminent domain.  The taking is a governmental action and does not qualify as a form of market participation. Accordingly, under the state action doctrine, SARAA is immune from federal antitrust laws and the court will grant SARAA's motion to dismiss.[20]

The court would be remiss if it did not acknowledge the obvious anticompetitive impact of the taking.  It is not unsympathetic to the concerns expressed in the complaint.  However, these concerns must be addressed in the eminent domain proceedings and the court is confident that the Court of Common Pleas of Dauphin County will ensure that the taking satisfies constitutional requirements of public use and just compensation.[21]  <u>Parker</u> immunity precludes this court from further review under the antitrust laws.

---

[20] By dismissing the complaint under the state action doctrine, the court need not consider SARAA's other arguments for dismissal.

[21] <u>See</u> U.S. CONST. amend. V; PA. CONST. art. I, § 10; <u>see also</u> 26 PA. CONS. STAT. ANN. §§ 1-101 to 1-903 (Eminent Domain Code).  The court notes that the condemnee has raised these concerns in the state court condemnation proceedings, <u>see</u> <u>supra</u> note 18, and that the Commonwealth has moved to intervene in the proceedings.

An appropriate order will issue.


　　 /s/ Christopher C. Conner　
CHRISTOPHER C. CONNER
United States District Judge

Dated:　　 March 21, 2006

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA,** | : | **CIVIL ACTION NO. 1:05-CV-1814** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SUSQUEHANNA AREA REGIONAL AIRPORT AUTHORITY,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

AND NOW, this 21st day of March, 2006, upon consideration of the motion to dismiss (Doc. 6), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion to dismiss (Doc. 6) is GRANTED.

2. Plaintiff's complaint (Doc. 1) is DISMISSED.

3. Leave to amend is DENIED as futile.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

4. The Clerk of Court is directed to CLOSE this case.


   /s/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge